## PETTIBONE, MULLIKEN & CO. v. AJAX FORGE CO.*

(Circuit Court of Appeals, Seventh Circuit.    October 7, 1902.)

### No. 870.

1. PATENTS—INFRINGEMENT—RAILROAD SWITCHES.

The Strom patent, No. 457,905, for a railroad switch, construed, and *held* not infringed, as to either form of tie-bar therein shown, by the device of the Bradley patent, No. 649,267.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

In Equity. Suit for infringement of letters patent No. 457,905, for a railway switch, granted to Axel A. Strom August 18, 1891. From a decree dismissing the bill, complainant appeals.

On the ground of noninfringement, the court below dismissed appellant's bill, which was based on letters patent No. 457,905, August 18, 1891, to Strom, assignor. In a split-switch the movable rails are planed to a point, respecting their width. The point-rails are coupled by a tie-bar, which, by means of its connections with the lever of a switch-stand, throws the switch. As the switch is set for the main or the side track, the appropriate point-rail should be brought into close contact with its adjacent stationary rail, while the other should stand several inches away from its fixed neighbor. If the contact is not close, the flanges on the wheels of engines and cars are likely to cause disaster. By the wearing of the rails, and of the bolts and nuts used in connecting them to the tie-bar, as well as by the accidental bending of the tie-bar, or other disarrangement of parts, the original fixity of relation between the point-rails becomes impaired, and the switch is made dangerous. At least 12 years before the Strom patent was granted, means were employed for spreading the point-rails to take up lost motion. The claims of the patent are these: "(1) In combination, a split-switch and a connecting medium for the switch-rails, adjustable lengthwise thereof, to set the gage, substantially as described. (2) In combination, a split-switch and a tie-bar, C, connecting the switch-rails, and adjustable lengthwise thereof, to set the gage, substantially as described. (3) In combination, a split-switch and a tie-bar, C, extending obliquely between and connecting the switch-rails, and adjustable at one end lengthwise of the adjacent rail, to set the gage, substantially as described." In the construction of a split-switch there is a natural convergence of the switch-rails toward their points. To effect the required spreading of the switch-rails, the tie-bar, C, of the second claim, is moved along toward their points and fastened at the proper place by means of clips and a series of bolt-holes in the web of each switch-rail. The tie-bar, C, of the third claim, is longer than the distance between the switch-rails, where one end of the bar is permanently pivoted, and does the spreading by being brought nearer to right angles and fastened to the web of the rail. Neither of these specific devices was ever made and used. Appellant marketed split-switches made under the Strom patents, No. 457,904, August 18, 1891 (same date as patent in suit, though applied for 11 days earlier), and No. 543,605, July 30, 1895. The former is spoken of in the record as the "Channel," and the latter as the "Transit" device. In the "Channel" patent, guard-rails are rigidly attached to the switch-rails, and extend some little distance beyond the points. The extensions are bent inwardly toward each other in the plane of the rail-flanges. The spreading of the switch-rails is accomplished by moving a bar forward into the throat of the convergence, and fastening it by means of plates that slide along the web of each rail, and are attached thereto at the proper point in a series of bolt-holes. In the "Transit" construction, to each switch-rail is rigidly fixed a plate that extends inwardly in the plane of the rail-flanges. In each

---

* Rehearing denied November 15, 1902.

plate is a series of holes in a right line that runs obliquely to the line of the rail, toward either the point or the heel of the rail. The switch-rails are spread by moving a bar forward, and bolting it at the proper points in the plates. Appellee is manufacturing split-switches under the Bradley patent, No. 649,267, May 8, 1900. To each switch-rail is rigidly fixed a plate that extends inwardly in the plane of the rail-flanges. In each plate is a circular opening with notched circumference. In the opening fits a toothed disk that has an eccentric bolt-hole. A bar, having jaws at each end, is securely bolted, through the eccentric holes, to the disks and plates. The separation of the switch-rails to compensate lost motion is effected by changing one or both eccentric bolt-holes to a point further removed from the rail.

W. H. Dyrenforth, for appellant.
James H. Raymond, for appellee.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge, after making this statement, delivered the opinion of the court.

At the bottom of appellant's argument lies the contention that each of the claims sued on is generic, and covers every construction in which the connecting medium between the switch-rails is used to separate them by being moved lengthwise of the rails. Before Strom's time it was old to join the switch-rails by a bar that had its ends pivotally connected with clips fastened to the rails. Brahn, No. 248,990, November 1, 1881; Parsons, No. 308,373, November 25, 1884. It was also old to counteract lost motion by spreading the rails through the agency of turn-buckle and screw-threaded devices. Dunwoody, No. 218,720, August 19, 1879; Stone, No. 292,144, January 15, 1884. In 1891 Strom showed how the tie-bar, C, of his second claim (the old Brahn or Parsons tie-bar), could be operated as a wedge to separate the switch-rails, by reason of their natural (old) convergence. As he said in his specification, "This means of adjustment depends for efficacy upon the normal convergence of the switch-rails toward their points." The second claim is a specific embodiment of this concept, which Strom stated broadly in his first claim. If there was invention in using the known bar to separate—which is the wedge's function—the existing convergence, in relation to which the bar was already placed (a question we do not consider), the new art, if any, consisted in moving the bar as a wedge lengthwise of the switch-rails towards their points,—an operation in which the entire movement is dependent wholly upon the normal convergence of the rails. The general art of separating switch-rails to take up lost motion was old. In that art a variety of means, of one general class, were employed, by which the required movement was obtained through increasing the effective length of the tie-bar,—an operation completely independent of the rails' convergence.

The old nonextensible bars of Brahn and Parsons were set at right angles to the switch-rails. In his third claim, Strom took the old tie-bar, increased its length beyond the shortest distance between the switch-rails, set it obliquely, and provided a series of holes in the web of one rail by which the tie-bar could be brought nearer to right angles. If there was invention in using the known bar as a brace between rails, in relation to which it was already found (a point we do

not decide), we are of opinion that the device in the third claim was, at most, an independent improvement in the known art. For the brace is adapted to separate parallel surfaces; its efficacy is wholly independent of convergence; if convergence is present, it is as an accidental state of the objects to be moved, and not as an essential condition to the brace's operation; the brace would work in a plane vertical and at right angles to the switch-rails as well as in the plane of their flanges; and the tie-bar, C, of the third claim, is within the principle of spreading the switch-rails by increasing the operative length of the connecting medium, as much as if at each movement a tie-bar of greater length were set at right angles to the rails.

In appellee's mechanism the range of increasing the distance between the eccentric bolt-hole and the rail is about three-quarters of an inch. This space is divided into many small portions. The separation of the switch-rails is accomplished by means of the eccentric. It is adapted to separate parallel surfaces. Its efficacy is wholly independent of convergence. It would operate as well in a plane vertical and at right angles to the rails. In a movement of the eccentric in the plane of the rail-flanges, which movement separates the rails, say, a sixteenth of an inch, the amount that may be attributed to the normal convergence of the rails is accidental, not of the essence, and wholly insignificant.

The first and second claims are not infringed, because appellee's device is not within the alleged new way that depends for its efficiency solely upon the normal convergence of the switch-rails. The third claim is not infringed, because that is in the old field, and must be limited to the means stated. Appellee's instrumentality and its operation are different. The brace, as it departs from a right angle, draws the switch-rails nearer each other, while they are spread by the movement of the eccentric bolt-hole away from the disk's diameter, drawn at right angles to the rail. The Bradley device we deem an independent and meritorious improvement in the old art of effecting the desired movement, regardless of convergence, by increasing the operative length of the medium that extends from rail to rail.

A considerable part of appellant's brief is devoted to a contention, in effect, that appellee infringes the "Channel" and "Transit" patents. As they are not sued on, this is not the occasion to test their validity and scope. For present purposes, it is enough to say that, if they are in the new field, the Bradley device is not; and, if in the old, that was open for independent improvements.

The decree is affirmed.